**DIME BOX PETROLEUM CORPORATION, Plaintiff–Appellant and Cross–Appellee,**

**v.**

**The LOUISIANA LAND AND EXPLORATION COMPANY, Defendant–Appellee and Cross–Appellant.**

Nos. 89–1302, 89–1303.

United States Court of Appeals, Tenth Circuit.

July 16, 1991.

As Amended Aug. 23, 1991.

Clyde A. Muchmore (Harvey D. Ellis, Jr., Karen Eby with him on the brief) of Crowe & Dunlevy, Oklahoma City, Okl., for plaintiff-appellant and cross-appellee.

H.R. McCollister of H.R. McCollister, P.C., Denver, Colo., for defendant-appellee and cross-appellant.

Before ANDERSON, BALDOCK and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

In this diversity case Dime Box Petroleum Corporation (Dime Box) owned an interest in various oil and gas leases that were being developed by the Louisiana Land and Exploration Company (LL & E). Dime Box sued LL & E claiming breach of contract, fraud, and breach of fiduciary duty. LL & E counterclaimed alleging breach of contract. Following a five day bench trial the trial court gave each party a partial victory and both parties have appealed. The district court's opinion is published as *Dime Box Petroleum Corp. v. Louisiana Land & Exploration Co.*, 717 F.Supp. 717 (D.Colo.1989).

## Background

Dime Box and LL & E first entered into certain preliminary agreements to acquire and develop oil and gas leases.[1] They sub-

---

1. Dime Box characterizes the preliminary agreements as joint venture agreements. Only one representative agreement is contained in the record on appeal. This is a "farm-out" agreement in which an oil and gas lessee promised to assign an oil and gas lease to LL & E. LL & E could earn interests in the lease by drilling a well. This agreement attached the operating

sequently entered into one or more operating agreements wherein LL & E was designated as the operator and had the duty to drill, complete, and produce wells,[2] and Dime Box had the duty to pay its proportionate share of the costs and expenses. Ultimately twenty-three wells were drilled on the leased lands, eleven of which were completed as producers.

Dime Box asserted LL & E breached its agreement by overcharging its costs of lease acquisition; by failing to purchase a portion of Dime Box's interest; and by failing to refund an overpayment. Dime Box also asserted fraud and breach of fiduciary duty arising from LL & E's supply of pipe for the completed wells.[3] LL & E contended Dime Box breached its agreement by failing to pay for its share of the cost of acquisition of certain oil and gas leases.

The district court found LL & E breached its agreement in two respects. First, the court found that LL & E failed to purchase certain of Dime Box's interests and so it awarded approximately $114,000 for this breach. 717 F.Supp. at 719. Second, the court found LL & E wrongfully withheld approximately $193,000 from Dime Box's share of production revenues. *Id.* The district court found against Dime Box on its remaining claims. The trial court found in favor of LL & E's counterclaim and awarded LL & E approximately $273,000. *Id.* The trial court then offset the awards and entered judgment for Dime Box for the difference, approximately $4,000. *Id.* at 723.

Rather than recite the parties' assertions of error, we will discuss them in the order raised: first, those of Dime Box; then those of LL & E. In deciding these issues, we will apply the law of Colorado as the jurisdiction of the district court was based upon diversity of citizenship.

# I

## Breach of Fiduciary Duty

██ Under Colorado law a fiduciary relationship exists between parties to a joint venture. *Lucas v. Abbott,* 198 Colo. 477, 601 P.2d 1376, 1379 (1979). Relying upon this law, Dime Box maintained in its complaint, at the pretrial, during opening statements, and during trial (717 F.Supp. at 720) that the fiduciary relationship arose as a result of the operating agreement. While a fiduciary duty may be created in several fashions, Dime Box predicated its trial theory on the fact that a fiduciary relationship was created in this case as a result of the operating agreement, which it maintained established a joint venture.

During trial, the evidence concerning this issue centered on whether LL & E breached its fiduciary duty concerning self-dealing and misrepresentation. The evidence showed that Dime Box received a monthly bill from LL & E for its share of the costs. Concerning pipe, the bill was supported by either a copy of the invoice from the pipe supplier or by a copy of a material transfer form if LL & E supplied the pipe from its own inventory. In the case of third-party pipe suppliers, Dime Box's evidence showed that LL & E sold pipe from its inventory to the suppliers under a buy-back agreement whereby LL & E would repurchase two to four times more pipe than it originally sold. LL & E treated all repurchased pipe as "inventory" regardless of its actual source and billed Dime Box for the pipe at a published mill price that did not include readily available discounts. The evidence also suggests that LL & E lied to Dime Box concerning its inventory and pipe pricing practices. LL & E's evidence tended to show these practices were prudent under the circumstances and were

---

agreement, which was the A.A.P.L. Form 610–1977 Model Form Operating Agreement. Paragraph 15 of the farm-out agreement specifically states the parties' relationship shall not be considered as a joint venture. For the sake of clarity, we will refer to these as the "farm-out" agreements.

**2.** Each agreement applied to different acreage. We will refer to these agreements as "the operating agreement."

**3.** LL & E supplied both casing and tubing. The parties have referred to this as tubular goods or tubulars. In the interest of brevity we describe these items as pipe.

common in the oil industry, which fact was well known to Dime Box. Had the trial court accepted Dime Box's theory of the case, Dime Box would have been entitled to an additional $88,000 for all wells.

The district court found the operating agreement was not a joint venture agreement and therefore concluded no fiduciary duty had been created. 717 F.Supp. at 722. In reaching this conclusion the district court relied upon two facts: First, the management of both Dime Box and LL & E was sophisticated and experienced in the oil and gas industry; and second, the operating agreement itself specifically established a standard by which the operator's conduct would be measured when it provided that LL & E would have no liability to Dime Box except for gross negligence or wilful misconduct. *See id.* Alternatively, the trial court found, as a matter of fact, that Dime Box had failed to prove any damages as to some of the wells. *Id.*

■ Dime Box first contends the trial court's conclusion that no fiduciary duty existed is wrong as a matter of law. Dime Box argues that as the operating agreement vests ownership of the oil and gas produced in the parties according to their interests, grants LL & E a lien on LL & E's production, and established a joint account to keep track of the income and expenses, a joint venture was clearly created.

■ Under Colorado law three elements must exist to establish a joint venture: (1) a joint interest in property; (2) an express or implied agreement to share in the losses or profits of the venture; and (3) conduct showing cooperation in the venture. *Agland, Inc. v. Koch Truck Line, Inc.*, 757 P.2d 1138 (Colo.Ct.App.1988); *Fulenwider v. Writer Corp.*, 544 P.2d 408, 410 (Colo.Ct.App.1975). The person asserting the joint venture has the burden of proving its existence. *Fulenwider*, 544 P.2d at 410. A joint venture cannot arise merely by operation of law; its legal force is derived from the voluntary agreement of the parties. *Id.* Whether a joint venture exists is a question of fact. *Agland*, 757 P.2d at 1139.

The undisputed evidence before the trial court establishes the parties had a joint interest in various oil and gas leases and had an express agreement to share in the profits and losses of the business of the venture, which was the exploration for, the development of, and the production of oil and gas. The conduct of the parties showed they were cooperating in this venture. Under Colorado law these facts establish a joint venture. *Agland*, 757 P.2d at 1138. Looking to the operating agreement we find LL & E, as the operator, has the power and duty to direct and has full control of all operations; all costs are borne by the parties in accordance with their interests; nonoperators have the right to inspect operator's books; operator has a lien on nonoperators' oil and gas rights to secure payment of its share of the expense; operator determines and pays the expenses from a joint account; and extensive accounting procedures are established for the operator to follow in its handling of both income and expense. A fair reading of the operating agreement clearly shows that operator decides what monies to spend, which decision is binding upon the nonoperators, and receives all the income from the operated property. The operating agreement thus places LL & E in the position of controlling Dime Box's share of both income and expense. That both parties to this operating agreement are knowledgeable, experienced, and sophisticated does not alter the fact that LL & E, as the operator, is in full control.

■ We have determined under Colorado law that a joint venture was created and that operator LL & E would owe nonoperator Dime Box a fiduciary duty unless the contract modified this obligation. We next consider whether the parties contracted for a standard by which to measure operator's conduct rather than utilizing the standards imposed upon a fiduciary. Article V of the operating agreement provides, in part, that operator has no liabilities to nonoperators for liabilities incurred except those arising from operator's gross negligence or wilful misconduct. Stated differently, the operating agreement provides that operator has no liability to nonoperator for negligence or

unintentional misconduct. This measure of conduct bears no relationship to the yardstick used to measure the conduct of a fiduciary. The operating agreement was a product of the parties' negotiations. 717 F.Supp. at 722. Dime Box makes no suggestion that the operating agreement was a contract of adhesion; nor that the parties had unequal bargaining power; nor that fraud or misrepresentation was utilized to induce the contract. A court does not ordinarily pass upon the wisdom of a contract, and a court may not advance arguments for a party. We are not persuaded the trial court erred in concluding the parties contracted for a standard to measure operator's conduct which is different than that applicable to a fiduciary.

Dime Box also contends we should look to the farm-out agreements to establish a joint venture. These agreements explicitly negate the existence of a joint venture.

## II

■ Dime Box next contends LL & E's excessive charges for pipe and its deceptive billing was "willful misconduct" and therefore actionable as a breach of the operating agreement. Dime Box also contends LL & E breached its duties as a co-tenant. LL & E responds by stating Dime Box is now offering two new causes of action. Dime Box replies by asserting this relief was suggested by its pleadings and under a liberal application of the Federal Rules of Civil Procedure it is entitled to relief.

The flaw in Dime Box's argument is that Dime Box, at least twice, specifically represented to the trial court and thus to LL & E that its breach of contract claims related only to other actions of LL & E, and that its claim relating to LL & E's pricing of the pipe was confined to its claim of breach of fiduciary duty. In the pretrial order and in Dime Box's opening statement, in response to a direct question from the trial court, Dime Box made it clear that its claim relating to LL & E's handling of the pipe was grounded only upon the theory of breach of fiduciary duty and not upon a theory of breach of contract.

We will not consider an issue raised for the first time on appeal. *Kenai Oil & Gas, Inc. v. Department of Interior,* 671 F.2d 383, 388 (10th Cir.1982); *CCMS Publishing Co. v. Dooley–Maloof, Inc.,* 645 F.2d 33, 37 (10th Cir.1981). The issues now being raised by Dime Box were neither suggested nor raised before the trial court and, in fact, were specifically negated by Dime Box before the trial court. LL & E was effectively denied the opportunity to present any factual defense it may have had to these breach of contract claims.

## III

■ Dime Box next contends the trial court's finding that Dime Box supplied its pro rata share of pipe to certain wells was clearly erroneous.

Concerning Dime Box's breach of fiduciary duty claim, the trial court found Dime Box supplied the pipe for some of the wells, specifically those in the area described by the parties as the Ambrose Project, and therefore had suffered no damage. 717 F.Supp. at 722.

LL & E agrees the trial court erred in holding Dime Box supplied pipe and concedes this factual determination has no support in the record. LL & E argues the mistake is harmless. We agree.

Dime Box's theory of the case was based on the existence of a fiduciary duty, which LL & E breached. The trial court's finding that Dime Box supplied pipe for certain wells related to Dime Box's claimed damages for this breach. Our holding that the measure of LL & E's conduct was not that of a fiduciary renders further discussion of this error moot.

## IV

### Executory Accord

■ One of Dime Box's claims involves an area the parties labeled "Cycle VI." The Cycle VI farm-out agreement provided that Dime Box would commit $350,000 for lease acquisition and LL & E would contribute $650,000. LL & E spent far more than the $1,000,000 agreed to by the parties. Dime Box and LL & E negotiated and

agreed that Dime Box's interest in this area would be reduced from approximately thirty-five per cent to twenty per cent. 717 F.Supp. at 720. As a part of this agreement Dime Box agreed to pay more than the $350,000 originally committed and agreed to initially overpay its reduced share. *Id.* LL & E in turn committed to refund Dime Box's overpayment by check and agreed not to withhold this overpayment by embroiling it in the parties' dispute. The trial court specifically found that LL & E breached this agreement, *id.*, by failing to refund Dime Box's overpayment. The trial court awarded $83,-917.76, which was the amount of Dime Box's overpayment. 717 F.Supp. at 720.

At pretrial, Dime Box requested judgment for the $75,000 overpayment "or, in the alternative, all amounts above the amount of $350,000" paid, i.e., $201,312. During closing argument Dime Box asked for the $201,312 and asked for that amount of acreage back.

Dime Box contends the trial court erred by not enforcing the original agreement which LL & E breached, and consequently LL & E should be liable for $201,314.96 rather than $83,917.76.

■ The district court specifically found Dime Box and LL & E had modified their existing contract and that LL & E had breached the modified contract by its failure to refund. 717 F.Supp. at 720. Whether a contract has been modified is a question for the trier of fact, *Uinta Oil Ref. Co. v. Ledford*, 125 Colo. 429, 244 P.2d 881, 884 (1952), which we review under the clearly erroneous standard.

■ Dime Box argues that the modified agreement was an executory accord, which is an agreement for the future discharge of an existing claim by substituted performance. Under Colorado law, the execution of an executory accord does not discharge the original debt unless there is specific wording to that effect in the "new" contract. *See Hinkle v. Basic Chemical Corp.*, 163 Colo. 408, 431 P.2d 14, 16 (1967).

Dime Box's legal theory is undercut by the facts. The original agreement was me-morialized in a letter from Dime Box to LL & E dated August 29, 1984. Paragraph 6 thereof provides Dime Box agrees to commit $350,000 and LL & E $650,000. "Any additional commitment will be mutually agreed to when these sums are spent. If no additional amounts are agreed to, all subsequent acquisitions will be governed by the AMI provision." This letter was agreed to and accepted by LL & E. LL & E plausibly argues that this agreement cannot be breached by overspending as it contemplates overspending, and the testimony of Dime Box's general counsel adds support to this argument. The record supports the trial court's finding that the agreement was modified and, as modified, subsequently breached. As there was no executory accord, any alleged breach of the original agreement must be deemed waived. We are not persuaded the trial court's findings are clearly erroneous.

## V

### LL & E's Cross–Appeal

■ One of Dime Box's claims was that LL & E wrongfully withheld a portion of Dime Box's production revenues. Concerning this claim the district court found as follows:

> During the course of their relationship, LLE withheld $359,227 in production revenues payable to Dime Box. Later, LLE refunded $165,959 of these revenues leaving a balance due from LLE to Dime Box of $193,268.

717 F.Supp. at 719.

LL & E contends this factual finding is clearly erroneous and cannot stand. It directs our attention to Exhibit 10 and contends, factually, that LL & E owed none of the withheld revenue to Dime Box. Exhibit 10 is a copy of a letter sent from LL & E to Dime Box that contained a check for $165,959.28. The computations on the detachable check stub tend to show that all LL & E owed was $165,959.28—the amount paid.

LL & E's contention ignores the other evidence contained in the record. Dime Box called a CPA who testified that LL &

E had improperly withheld $193,268 of Dime Box's revenue. We note LL & E offered no evidence on this issue and failed to cross-examine the CPA with respect to his calculations. The district court's factual findings are supported by substantial evidence and are not clearly erroneous.

■ LL & E's next contention is that the trial court's factual finding that a refund was due Dime Box for an overpayment of $83,917.76 was clear error.

Concerning this contention the district court found as follows:

> To facilitate LLE's obtaining additional partners to buy the 15% interest in Cycle VI, Dime Box agreed to pay 35% of the billings of a portion of Cycle VI and LLE agreed to refund thereafter the overpayment by check. (Exh. 26 and 27) The overpayment amounts to $83,917.76. LLE never refunded this overpayment by check or credit and therefore Dime Box overpaid LLE on Cycle VI a total of $83,917.76.

717 F.Supp. at 720.

Again LL & E directs our attention to some of the exhibits introduced into evidence and ignores testimony and other exhibits. For instance, Dime Box's counsel testified the amount was $83,917.76. Again we note LL & E introduced no evidence to the contrary.

■ Fed.R.Civ.P. 52(a) provides that findings of fact made by a trial court shall not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there may be evidence to support it, the reviewing court on the basis of all the evidence is left with the definite and firm conviction that a mistake has been made. *Amoco Prod. Co. v. Western Slope Gas Co.*, 754 F.2d 303, 309 (10th Cir.1985). We have no such conviction in the case before us.

The judgment of the district court is AFFIRMED.